MARCELLUS S. AYER & another *vs.* R. W. BELL MANUFACTURING COMPANY.

Suffolk.    March 7, 1888. — May 5, 1888.

Present: MORTON, C. J., DEVENS, W. ALLEN, C. ALLEN, & HOLMES, JJ.

*Contract in Writing — Extrinsic Evidence — Collateral Agreement — Agent's Authority — Evidence.*

A written order for goods, signed by the buyer only, set forth the kind of goods and the price agreed upon, and contained stipulations as to rebates. *Held*, that evidence of a collateral oral agreement by the seller to advertise the goods was admissible.

In an action for the breach of such an agreement, there was evidence that the seller, a soap manufacturer, was introducing a new brand by extensive advertising, as was customary, and by the offer of gifts to the largest consumers, to be distributed on a certain day; that the seller sent an agent to the buyer, a wholesale firm, in answer to a letter inquiring "what the terms and inducements are to jobbers"; that the agent, when told that the buyer would not purchase a certain quantity unless the seller would advertise, promised to keep up the advertising; that shortly afterwards the seller, in letters to another firm, to which the same agent had sold soap, wrote that "the advertising, etc., as he agreed" would be attended to, and that a person had been sent "to do the advertising" as agreed; that the agent admitted that he made the agreement with that firm without prior authority, but stated that he made it subject to the

seller's approval.  *Held*, that there was evidence to go to the jury, that the agent had authority to make agreements to advertise.

Evidence that a person, to whom the manufacturer sold out his business, advertised after the day for drawing the gifts, and after the alleged breach, was *held* inadmissible.

CONTRACT to recover for a breach of a warranty of quality of certain soap sold by the defendant to the plaintiffs, and of a promise to advertise it.   Writ dated July 12, 1886.   At the trial in the Superior Court, before *Blodgett*, J., there was evidence tending to prove the following facts.

The plaintiffs, who did business under the name of M. S. Ayer and Company, were wholesale grocers in Boston, and the defendant was a soap manufacturer in Buffalo, New York.   In February and March, 1886, the defendant extensively advertised in various newspapers in Boston and vicinity, as well as by the use of circulars and pamphlets, a brand of soap called the French Villa Soap, which was comparatively new to the New England market.   These advertisements, besides commending the quality of this brand of soap, recited lists of gifts of various kinds that were to be distributed by the defendant on October 30, 1886, to those consumers who meanwhile should use the largest quantity of soap, and should prove that fact by returning to the defendant certificates properly filled out, a blank for which was placed in the wrapper around each cake of the soap.

On March 5, 1886, the plaintiffs sent to the defendant the following letter, signed by them :

" Boston, March 5, 1886.   R. W. Bell Manufacturing Co., Buffalo : Gentlemen, Noticing your advertisement in this vicinity on French Villa Soap, we write to know what the terms and inducements are to jobbers.   Please furnish us such information, at the same time state if you are able to make prompt shipments."

On March 6, 1886, one Breyfogle, who was in the employment of the defendant, was directed by a telegram from it to call upon the plaintiffs, and, having done so, sold to them two hundred and fifty boxes of the French Villa Soap, whereupon the plaintiffs signed and delivered to him the following order written upon a printed form furnished by Breyfogle :

" Special inducement for the introduction of French Villa Soap, which will not be duplicated.    Boston, March 6, 1886. R. W. Bell Manufacturing Co.: Gentlemen, Please send 250 boxes French Villa Soap, at $7.25 per box, less freight and 50 cents per box rebate, payable quarterly.    That there shall be no further claim made or allowed on this sale of French Villa Soap, and that the same shall be promptly paid for at the expiration of the time on which it was sold.    If sold less than $7.25, we forfeit rebate.    Terms: 60 days' acceptance, or less 2 per cent discount on sharp cash.    If they reduce the price, they will all [allow] the reduction on all goods on hand at that time."

The soap thus ordered was subsequently received by the plaintiffs, and paid for by them on or about March 30, 1886, but they declined to pay for further lots ordered by them, on the ground that the defendant had not fulfilled its alleged contract to advertise the soap.

Evidence was also introduced tending to show that advertising in the soap trade was done universally by the manufacturers, and not by the jobbers; that such advertising was necessary to introduce a new brand of soap successfully; and that the advertisements of the defendant made in Boston and vicinity relating to the French Villa Soap were almost entirely discontinued early in 1886.

One of the plaintiffs was permitted to testify, against the objection of the defendant, to prove its alleged agreement to advertise the soap, that, in the conversation with Breyfogle when the above order was given, he told Breyfogle that the plaintiffs would not think of buying such a quantity of the soap " unless we were sure they would advertise it liberally, not only in the Boston papers, but in the local papers which would reach consumers, because the sale would have to come from consumers direct"; that Breyfogle replied, that " they were going to advertise it more liberally than any soap put on the market"; that in mentioning other brands of soap of which the plaintiffs had made large sales because of liberal advertising in local papers, he told Breyfogle that the French Villa Soap would have to be advertised the same as the other brands of soap referred to, and that Breyfogle in reply said that the soap would be " advertised

in that way"; and that Breyfogle said further, " We are not only going to advertise as I have told you, but we are going to hire a store, a front, on Washington Street, one of the most conspicuous places we can get, and keep on exhibition there a sample of everything that is to be given away, for instance, the organs, the pianos, and the diamonds and silver ware, and it will be advertised and will be there on exhibition, a front on Washington Street, where the public will understand they can go and see the goods, and we shall keep it before the people constantly until the time when the gifts are to come off," on October 30, 1886.

The witness, in reply to the question, " Have you stated whether he said anything about the demand that he would create by advertising?" said that Breyfogle told him that the plaintiffs would not only " want that quantity, but they should advertise so that we should want at least twenty-five hundred boxes before the drawing should come off, not only the two hundred and fifty boxes, when I spoke of its being a considerable quantity, and he repeated that idea two or three different times, and then added that what he had done in other States he knew he could do here in Massachusetts, New Hampshire, and Maine"; and in answer to the question, " Have you stated what he stated about keeping up the advertising any length of time?" said that Breyfogle told him that the advertising would be kept up " continuously until the drawings should come off, the next October, continuously before the public by advertising these circulars and handbills daily throughout the State, also the other States which he was afterward to canvass in the same way."

The same witness also testified, that, after the plaintiffs wrote to the defendant declining to pay for the further lots ordered, Breyfogle called upon them in order to effect a settlement, and wished to know what the trouble was ; that he told Breyfogle that the defendant " had not advertised it in any respect as he agreed upon doing," and that " we have sent soap on your representations that it should be advertised," no customer having bought a second box of it ; that Breyfogle said " they were going to advertise it, but were going to do it their way"; that Breyfogle, in reply to the assertion by the witness, " But you agreed to advertise it continuously," said, " Well, we are going to advertise, and are going to do it in our way ; and in the course

of a month or six weeks"; and that Breyfogle, in reply to the further suggestion made to him by the witness, "You have not advertised as you agreed to at first, how do we know you are going to do it?" replied, "Our men are at work advertising the soap."

Breyfogle, who was called as a witness by the plaintiffs, testified that he had no connection with the advertising branch of the defendant's business; that he had no authority to bind the defendant by a contract to advertise, and that he did not in fact make such a contract; that under a special arrangement he had sold to the firm of Twitchell, Champlin, and Company, of Portland, Maine, who were to have the exclusive right of sale in that State, excepting Bangor, five hundred boxes of the soap, the defendant to do the advertising in all towns from five thousand up; that this arrangement was made by him expressly subject to the approval of the defendant, to whom he afterwards reported it, and who wrote him that it had accepted the proposition, and complied with his order.

The plaintiffs were allowed, against the defendant's objection, to introduce in evidence two letters from the defendant to Twitchell, Champlin, and Company, the first of which, dated March 19, 1886, after mentioning that the order for the five hundred boxes had been received from Breyfogle, recited that "the advertising, etc., as he agreed, will also be properly attended to"; and the second of which, dated April 17, 1886, set forth that the defendant had "sent a man to your State to do the advertising, in accordance with the agreement made by Mr. Breyfogle, and he is doing it now."

The defendant offered to show that the World Manufacturing Company, to whom it sold its entire interest in the French Villa Soap, on or about May 1, 1886, continued the advertising after October 30, 1886, but the court excluded the evidence.

The plaintiffs were permitted, against the defendant's objection, to introduce evidence to prove a warranty that Breyfogle stated to the plaintiffs that the soap was of "good quality," and that it was of the "best quality of laundry soap, and better than any laundry soap in the market."

The defendant asked the judge to instruct the jury, that there was no evidence to warrant the finding of authority in Breyfogle

to make the alleged contract to advertise; that there was no evidence from which they could find any contract to advertise, since the order given by the plaintiffs to the defendant showed no such contract, and that Breyfogle had no authority merely as selling agent of the defendant to bind them by any contract to advertise; and that the plaintiffs cannot recover on such a contract unless the jury is satisfied that Breyfogle had express authority which would authorize him to make the contract declared on.

The judge gave the request as to the authority of selling agents, but refused to give the other instructions asked for, and instructed the jury, among other things, on the question of Breyfogle's authority to bind the defendant by an agreement to advertise the soap, that, when the defendant received from the plaintiffs their letter of inquiry of March 5, 1886, " This defendant might have replied by letter, stating what the inducements were ; it did not choose to do so; it sent a man to answer this letter. It was impossible for the plaintiffs to know what his instructions were from his principal, or what authority he had. Having trusted to him to make the statement as to what the inducements and terms were, the defendant is bound by it. I say it is bound by it, speaking generally. Undoubtedly it might be true that, under circumstances like these, the agent might have made some promise so extravagant and unnatural, so foreign and repugnant to ordinary business methods and usages, that the defendant would not be held by it. But in view of the admitted facts, that this advertising had gone on for some days, that this was a new soap so far as this market was concerned, that there is evidence tending to show that the manufacturer advertises the soap and not the jobber, and evidence tending to show that to introduce a new soap and secure a successful sale for the soap, it is necessary to advertise extensively and systematically, it cannot be said, as matter of law, that the promise to continue this advertising was one of those extravagant and unreasonable promises which the agent could not make, and by which the principal would not be bound. And so I say to you, that if you find the facts as to the receipt of the letter by the defendant, the direction to Breyfogle to call, that Breyfogle did call, and you are satisfied upon the evidence that it is the usual practice for the

manufacturer to advertise the soap, that it is necessary to advertise a new soap, in connection with the admitted facts, that there had been this advertising before the 6th of March, and that it was a new soap so far as this market is concerned, you may well find that Breyfogle was authorized to make this promise."

The judge further instructed the jury as to the sale by Breyfogle to Twitchell, Champlin, and Company, that "Breyfogle says that whatever promise there was, as to advertising the soap in the State of Maine, was a conditional promise, and that it was a matter to be submitted to his employer, the defendant corporation, in Buffalo, and if they were willing to assent to it, then the advertising was to be done. If that is the promise that Mr. Breyfogle made, if it was conditioned on the approval of the defendant, then the evidence is of no importance on the question of Breyfogle's authority to make the promise to the plaintiffs upon which the plaintiffs rely. But, on the other hand, if you are satisfied that Breyfogle made an unconditional promise to advertise this soap, and the defendant recognized that, and promised to advertise, it is some evidence tending to show that Breyfogle had something more than the ordinary authority of a salesman, and that he had authority to make a promise such as the plaintiffs say was made in this case."

The judge also instructed the jury as to the alleged warranty that the statements by Breyfogle did not constitute a warranty, and submitted the case to the jury solely upon the issue as to the alleged agreement to advertise. The jury returned a verdict for the plaintiffs; and both the plaintiffs and the defendant alleged exceptions.

*J. B. Warner & H. E. Warner*, for the defendant.

*G. Putnam & J. Fox*, for the plaintiffs, stated that, if the defendant's exceptions should be overruled, the plaintiffs would waive their exceptions.

HOLMES, J. 1. The plaintiffs' written order for soap was drawn to bind them only, was signed only by them, and does not contemplate the defendant's signing it. There was no necessity that it should set forth the whole consideration, especially collateral undertakings, on the part of the defendant. It purports to state what the plaintiffs agree to buy, and the price which they agree to pay. The stipulation for a reduction on

goods on hand, if the defendant should reduce the price, relates to the price.   The provision in favor of the seller, " that there shall be no further claim made or allowed on this sale of French Villa Soap, and that the same shall be promptly paid for," etc., refers to claims for a rebate based upon some complaint as to the thing sold.   Evidence of a collateral oral undertaking by the defendant to advertise was admissible.   See *Hazard* v. *Loring*, 10 Cush. 267.   *Erskine* v. *Adeane*, L. R. 8 Ch. 756.   *Morgan* v. *Griffith*, L. R. 6 Ex. 70.   *Lindley* v. *Lacey*, 17 C. B. (N. S.) 578. *Eighmie* v. *Taylor*, 98 N. Y. 288.

2.   There was some evidence that the plaintiffs said that they would not buy the quantity purchased unless they were sure that the defendant would advertise the soap liberally in Boston and local papers, and that the defendant's agent, Breyfogle, promised to keep up advertisements of the soap until October 30, on which day the various gifts promised in the advertisements were to be distributed.   The defendant denies its agent's authority to make the promise; but we are of opinion that there was evidence to go to the jury.   The agent was sent by the defendant to the plaintiffs in answer to a letter inquiring " what the terms and inducements are to jobbers."   It appears on the face of the printed form produced by Breyfogle, upon which the plaintiffs wrote their order, that the offer of some sort of special inducement was contemplated.   It was important to the success of the plaintiffs in selling the soap, that the advertisements should be kept up until the date for distributing the gifts, which were promised to the consumers of the largest amounts. It is usual for the manufacturers to do the advertising, and the defendant was doing it at the time of the agreement.   Therefore, an undertaking by the defendant to continue what it was doing, and what parties in its situation usually do, was, or might have been found to be, a natural inducement to a wholesale purchaser, and one which the plaintiffs reasonably might assume to be within Breyfogle's authority to offer, when he was sent to answer their inquiries.

There was also evidence that, later in the same month, the defendant, in a letter to another firm with whom Breyfogle had made a contract, wrote, " The advertising, etc., as he agreed, will also be properly attended to," and afterwards wrote that a

man had been sent "to do the advertising in accordance with the agreement made by Mr. Breyfogle." Breyfogle in his testimony impliedly admitted that he made this agreement without previous authority, but stated that he made it subject to the defendant's approval. The jury may have believed the admission, and at the same time may have disbelieved the qualifying statement on the strength of the letters, which, on their face, seem to import, not ratification, but the recognition of an agreement already made and binding. *Case* v. *Baldwin,* 136 Mass. 90, 91. If the jury took this view, the letters were evidence that contracts to advertise were within the scope of Breyfogle's general authority. See *Lovell* v. *Williams,* 125 Mass. 439. *Reed* v. *Ashburnham Railroad,* 120 Mass. 43. They were instructed that, if the agreement was conditional, the evidence was of no importance on this question.

It was suggested that the judge ruled that the defendant was bound by Breyfogle's acts as matter of law; but looking at the whole charge rather than at one isolated expression, we think that the jury must have understood that the question was left to them.

3. Evidence that another company to which the defendant sold out its business did advertise after the day for distributing the promised gifts to purchasers had gone by, when the time covered by the defendant's alleged contract had expired, and the breach was complete, was properly excluded.

The plaintiff's exceptions are waived.

*Exceptions overruled.*