# PURITY ICE COMPANY *v.* HAWLEY DOWN DRAFT FURNACE COMPANY OF MARYLAND.

CONTRACTS; SALES; EVIDENCE; WARRANTY; BURDEN OF PROOF.

1. *Quære,* whether, in an action by a vendor to recover from the vendee on a contract consisting of a written proposition by the vendor to sell certain furnaces and an acceptance thereof by the vendee, evidence offered by the vendee of a warranty by the vendor of the furnaces is admissible, which consists of a printed circular containing certain express warranties, and concluding: "Should our furnaces fail to do as guaranteed, we agree to remove them and replace the former setting at our expense;" which circular was exhibited to the vendee by the vendor when the order for the furnaces was solicited.
2. Where the defense to an action to recover the purchase price of furnaces delivered to the defendant and in use by him is that they failed to conform to certain express warranties made by the plaintiff, the burden is not on the vendor to show that they came up to such warranties, but is on the vendee to show that the furnaces failed to conform to the warranties made.

No. 1330.   Submitted October 20, 1903.   Decided November 5, 1903.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia on the verdict of a jury in an action to recover the instalments of the purchase price alleged to be due on a contract of purchase.    *Affirmed.*

The COURT in the opinion stated the case as follows:

This action was begun in the name of the Hawley Down Draft Company, for the use of Vick, Whiting & Co., lessees, etc., against the Purity Ice Company, to recover the sum of $500, being the amount of certain instalments due upon the following contract:

"BALTIMORE, Feb. 11th, 1901.

"PURITY ICE COMPANY,
          "Washington, D. C.

"GENTLEMEN: We propose to furnish you two Hawley down draft furnaces and attach same to Campbell & Zell boilers of about 275 H. P. each. We to furnish suitable front (lower part) grate bars and all necessary pipes and fittings, also all special tile necessary to make the furnace part complete. For the sum of twenty-five hundred dollars $2,500.00.

"Terms two hundred dollars on the completion of our work, and the balance to be paid in monthly instalments 10 per cent of coal bill each; payable not later than the 5th of each month.

"We agree to furnish free of cost for a term of two years any part of water grate or water connections.

"Furnace to remain our property until accepted and paid for by purchaser.

"No provision hereof can be waived or varied, except in writing and signed by us.

              "THE HAWLEY DOWN-DRAFT FURNACE
              CO. OF MARYLAND;
              "VICK, WHITING & Co. Lessees.
              "HENRY VICK, Manager.

"Accepted.
          "PURITY ICE COMPANY,
              By J. E. McGaw, Mgr.

"We accept conditions of above proposition and agree to make settlement accordingly.

"The completion of the boilers not to be delayed by the attachment of furnaces."

Issue was joined upon the defendant's plea of *non assumpsit*.

One of the use plaintiffs, Henry Vick, testified that his copartnership were the lessees, for Maryland and the District of Columbia, of the patent rights of the nominal plaintiff, and that he submitted the proposition which became a contract by the acceptance of defendant, the figures $150 therein having been

erased and the words "10 per cent of coal bill" inserted in their stead. He further testified to the installation of the plant, as described; also that the defendant's monthly coal bills averaged $1,000, and that nothing had been paid on the contract.

The bill of exceptions then recites the following proceedings relating to the defense:

Thereupon the cross-examination of the witness was begun and counsel for the defendant stated that he proposed to ask questions of the witness to elicit what negotiations and representations had been made by him before the execution of the agreement, to which counsel for the plaintiff objected on the ground that the evidence sought to be introduced was not admissible because the written agreement set forth in the declaration embodied the whole contract of the parties, that evidence of antecedent negotiations or representations should not be given for the purpose of altering or varying the written agreement, that such evidence was inadmissible under the pleadings, and that it could not in any event be obtained on cross-examination. Counsel for plaintiff admitted that he had actual notice of the defenses.

Whereupon the court suggested that all testimony of this nature be taken subject to exception on the part of the plaintiff with the right to the plaintiff at the proper stage of the proceedings to move to strike out all such testimony. The court further saying, by way of explanation: "It is very common practice, all this testimony now goes in subject to exception. If finally the court finds it is not proper, then on motion to strike out it is as if it had never been spoken and defendant's counsel can except to the ruling. If, on the other hand, the court holds it is proper testimony to go to the jury, then the plaintiff's counsel can except to all that character of testimony, thus both sides get the benefit of the ruling."

Thereupon and under the arrangement above stated the witness testified on cross-examination as follows:

"The reason for the change, to '10 per cent of coal bill' was so Purity Ice Company would not be out. I assumed that there would be at least a saving of $150 on coal a month and estimated the percentage at 10 per cent."

"*Q.* You understand the difference between estimating and guaranteeing, do you not, Mr. Vick?

"*A.* I did not guarantee anything in that contract.

"*Q.* I asked you if you knew the difference between estimating and guaranteeing?

"*A.* Very plainly.

"*Q.* I want to get a complete answer whether you made a guarantee or an estimate.—

"*A.* If I made a guarantee it would be in the contract.

"*Q.* It would have been in the contract?

"*A.* Yes. We made various kinds of contracts, one guaranteeing and one not. I knew when to stop.

"I recognize the paper handed me as a circular issued by the Hawley Down Draft Furnace Company and know its contents thoroughly. I did not draw McGaw's attention to the guarantee on page 11 of this circular which I handed him.

"I said to Mr. Lee Hutchins at various times when I was drawing his attention to the furnaces that, instead of paying coal merchants what he had been in the habit of paying, to pay me for a limited period of time the saving that the furnaces would make to him.

"The old condition was four old return cylinder boilers in one boiler house, rated at about 100 horse power. McGaw had then no intention of building new boiler house or new boiler or new stack or anything else. I told him I was willing to put one furnace on one boiler and make a comparative test. If my furnace did not show a saving I was to take the furnace out and put his boiler back in the condition it was in before and he was nothing out. If it did, he was to pay me a percentage of the coal bill saved. When they got ready to put in the new boiler plant it necessitated a larger plant, doing away with two boilers, briefly, and the consequence was I could not tell what his coal consumption would be under the new instalment and referred him to the Bureau of Engraving, the Star building, the Post building, and the U street pumping station, where they pumped the water and weighed the coal and had an accurate re-

sult of the water pumped and the coal burned. I told them to refer to the records on file and they would be able to see the results and if the furnaces then was satisfactory to them I would put them in. I had him satisfy himself on the boilers here with like conditions and like boilers. I accepted the contract and hurried the work along as fast as possible and the furnace is in and working to-day. The furnaces will do everything that was expected of them, while not guaranteed. I could not guarantee them because I did not know the conditions that would follow after installation. With new machinery and new boilers and everything it would be a piece of folly for me to make any guaranty based on uncertainty. I wrote a letter after the installation on April 29th, asking for the first $200 due on the work, and in reply received a letter signed by Mr. Lee Hutchins calling my attention to the fact that I had guaranteed a whole lot of things and if I did not fulfil my guaranty he would not pay the bill. I then came over to Washington and met McGaw and we talked for fully an hour, and I said that I was under no obligation and no guaranty to make any tests, but, in order to set McGaw right before his people, I was willing to make a test. He said, 'I went down there the other day just as they were reading the letter and they jumped all over me, finding fault with the contract I signed.' I said, 'In order to set you right before your people I am willing to go to the expense of $100 or $125 to make a test of the boiler,' showing that the boiler was developing the horse power I told him they would get after visiting the plant. I also told him if he would assist my men I would come over there and put in tanks and get all ready; and for making the test I engaged a man at $50 a day to come over from Philadelphia and make the test, not because I was under any obligation to do it, but in order that he might make himself right before his people. I brought this gentleman over from Philadelphia and made all arrangements to make the test. Then McGaw wanted it made in a certain way, and I said, 'There are certain rules of the Society of Mechanical Engineers to be followed in running these tests. This man is a member of the Society of Mechanical Engineers and these people have rules, and if you want that

test made that way I will run it, but if I am not permitted to run the test according to these rules,' I said, 'we will call the test off.' ' He consulted with the engineer, Mr. Thompson, very carefully, and Mr. Thompson and he decided that he was all ready. We got already to start the test, and when we got ready McGaw came back from his breakfast and said, 'Now, are you going to run this test half water through the heater and half through the tank?' I says, 'We are going to run it all through the tanks so we will know to an ounce every pound of water that is evaporated and every pound of coal that is burned.' And he said, 'That won't be satisfactory to me.' And I said, 'If it is not satisfactory to you, I am through.' There was a whole lot of pipe in connection with the pumps. The water was pumped from the heater or pumped through the heater. It was taken from the main and pumped to the heater and through the heater into the boiler and those pipes passed down underneath the ground and the elbows and valves and various other connections were buried out of sight and in order that we would have no air and no leak,——the valves might leak and let the water pass off which might otherwise show evaporation; and it was in the interest of accuracy that these pipes were carried above the ground so we would see there was no leakage and no water leak out that did not go through the pumps and none leak out that would be wasted. And if we run that test as he wanted it would show a larger evaporation than it otherwise would have, and it would show the boiler doing more work than it actually did. I wanted to use this method for its accuracy. I gathered up my tools and got my helpers together and walked off, and the next thing was I notified them that they would have either to pay or put it in court."

Whereupon the plaintiff rested. It was understood and agreed between counsel on both sides and the court that the arrangement made during the cross-examination of the witness Vick should apply to the testimony of the witnesses for the defendant, and that all the testimony touching conversations or negotiations between plaintiff and defendant antecedent to the agreement of February 11, 1901, or concerning negotiations as

to capacity of furnaces either as to saving of fuel, consumption of smoke, as to tests or catalogues, or any other subject connected with said furnaces, should be understood to be objected to by plaintiff and with the right to plaintiff to move at the close of the case to strike all such testimony out.

And thereupon the defendant to prove the issues joined on its behalf produced Lee Hutchins, who being duly sworn testified as follows:

"I am the treasurer of the Purity Ice Company. I had a conversation with Vick in regard to improved furnaces which would consume smoke and save coal the first time I met him in the middle of January, 1901, which was just after the smoke law was passed. Vick told me that he would install the Hawley down draft furnaces in place of the furnaces furnished in the new boilers. We were about to complete a plant with larger boilers and Vick told me that his furnace would consume the smoke and save 15 per cent of fuel that we had before used to produce the same power and we could pay him the saving, the first payment to be taken in the shape of boiler fronts, and grates thrown out of service or displaced by his. I was in a hurry and told Mr. Vick and McGaw who had authority to make contracts for the Purity Ice Company, to talk it over and see me again, which they did some weeks after. I told him that we incurred a pretty heavy bill for the plant, and he again stated that this would be no extra drain on the resources because we only paid as we saved, and we paid him instead of paying the coal bill that we would have to pay anyway."

Whereupon witness was asked: "Did you visit any plants equipped with this down-draft furnace?"

"*A.* Only one; the Centre market,—yes, I did; the U street pumping station after the contract was made.

"*Q.* Before that?

"*A.* No, sir. Mr. Vick and I went down to the Centre market power house.

"*Q.* Did you make any examination of it?

"*A.* I watched it for about half an hour or three quarters.

And witness further went on to say: "I told him that we were going to put in new Campbell & Zell boilers, and we could not see how we could estimate a saving because we never used those boilers.   We had used and were going to tear out, in order to put in this very machinery, three or four old boilers.   I suggested 3 pounds per horse power per hour as a fair estimate, that is, for the consumption of those boilers with the ordinary grates; no special devices or anything of the kind.

"*Q.* By grates, you mean furnaces?

"*A.* Furnaces; that is part of the grate.   He said we could take that as a basis of comparison and he would guarantee a saving of 15 per cent on that basis, and would prove it by a test; and that if it was not satisfactory he would take the boilers out and restore the old furnaces and grates and boiler fronts; because he takes out half the boiler front to put his device in.

"*Q.* I want to be certain about this,—as to the time when this conversation took place in reference to the test.

"*A.* At the time the test was to take place?

"*Q.* The time of the statement as to the test?

"*A.* It took place at the second interview I had with Mr. Vick.   It took place about the 10th of February, 1901.   The Hawley down draft furnace makes no difference as to our coal bill, that is, compared to the consumption under the old tubular boilers.   The new boilers had an automatic feed which the old boilers did not have, and which is supposed to be a saving by regulating and keeping a uniform heat of water in the boiler.

On cross-examination witness said, "I took the old boilers out about the middle of January or the 1st of February, 1901, and I am still using those two furnaces."

On redirect examination the witness testified: "Mr. Vick and his attorney called to see me in July, 1901, and demanded payment, which I refused.   They left the office together, and the attorney returned in less than a minute or two and asked whether I considered that I had accepted the boilers.   I declined to answer that question, and he said, 'Well, we consider that you

haven't accepted them and we shall remove them,' and I said 'All right.' "

Whereupon the defendant to prove the issues joined on its behalf produced J. E. McGaw, who, being duly sworn, testified as follows:

"I am the president and general manager of the Purity Ice Company, and installed the plant there in 1895. The first time I ever saw Mr. Vick was in the first half of January, 1901, when he came into the office and introduced himself and said he wanted to talk with me in regard to a furnace. He pulled out a catalogue and said that he understood that we were going to add new machinery to our furnace and he wanted to install his furnaces."

Whereupon the defendant offered in evidence the catalogue identified by the witness, and upon the objection of the plaintiff's counsel, the court refused to admit the same, to which ruling the defendant by its counsel then and there duly excepted, and the court noted the exception upon its minutes.

Thereupon in connection with the foregoing testimony and matters the witness further testified:

"It would save fuel and increase the efficiency of the boiler at least 25 per cent. We then had in four return tubular boilers that we were working our plant with at that time; and I told him I was going to take those out and put in one or two boilers. Well, he says, 'I can install this furnace under these boilers and increase the efficiency of the plant at least 25 per cent and make the coal saving from 12 to 15 per cent. If I don't do this I am willing to take these furnaces out from under your boilers and install the old grates, and put your new boilers in the same condition that they would be if we had not installed our furnaces.'

"I told him I had just made a contract for $53,000 worth of machinery, with the De La Verne Ice Machine Refrigerating Company, and if he would come around in a year's time, I would be glad to talk with him and might feel like spending some more money for machinery, but at this time I did not care to talk about it because I did not care to go deeper into expense, and Vick said, 'This is just the point I want to talk with you on.

You say you want to manufacture ice as cheaply as anyone else; and by putting in these furnaces under your boilers that you are going to install, the Campbell & Zell water tube boilers, I can save you at least from 12 to 15 per cent of the coal bill which you pay to me instead of the coal man.' The next time I saw him, a few days later, he told me the price of his furnace was $2,500 for the two; and he said, 'in a year or so you will pay for these machines by the saving of 12 to 15 per cent in the coal bill, and you will never miss it.' He said, 'The money you are paying out to coal men you will pay to me, and at the expiration of a year or so you will have this device already paid for, and won't miss it.' The third time he came he brought a boiler man with him named Barr and introduced him to me to sell me boilers. I told Mr. Barr that we had contracted for boilers and we did not wish any, and Mr. Vick began on me about the Hawley down draft furnace. The next time I saw him was at Hutchins's office, and we talked about the Hawley down draft furnace in a general way. Later in the evening Vick came up to the office after dark, and said, 'Well, Mr. Hutchins and I were down at the Centre market, and he seemed to like the furnaces very well, and everything is arranged for you to now sign the order,'—the contract for the furnaces—he had it with him. I said, 'You understand, Mr. Vick, I don't want to put anything into this because I am afraid it will delay the installation of the machinery.' I was under contract with the De La Verne Company to give them a new engine room, and I was taking the old boilers out of the old boiler room and making an engine room of it, and I was under contract to give the De La Verne Company the old boiler room for an engine room on March 6th. And I said, 'You understand this very clearly, that I cannot afford to be delayed, but, if Mr. Hutchins says to me to sign this contract, why, I will do it, but the proviso must be put in here that I shall not be delayed.' And we were delayed about ten days, or perhaps two weeks. And I insisted upon him putting it in at that time. Later after the furnaces were in and Mr. Vick asked for the remittance of $200, I told him he must make the test which he promised, and he said, 'Suppose I make this test and it does

not turn out satisfactory, will you pass these furnaces?' I said to him, 'Emphatically, I will not.' And he said, 'Why you have had the use of them for two months.' And I said, 'That does not make any difference; I haven't accepted them and I will not accept them until the test is made. Now, you don't want to act the boy. If you are sure you have got a good thing, why, make the test and demonstrate that you have, and I will see you get the money,' and he said, 'I will make the test.' And I said, 'Well, that is like a man.' And he said, 'We have to get a couple of barrels, I will be up there to-morrow.' I think he said to-morrow. He did come, and he prepared to make the test under the ordinary circumstances,—under the conditions that we were then running. We were taking water and running it through the heater and comparatively heating it before we put it into the boilers, and he arranged to make the test under those conditions. I furnished him the barrels and the pipes that were necessary to connect the barrels to the hot-water heater also to the feed-water pump, and the barrels were measured and weighed and a stamp made on everything. The bed of the furnaces were cemented and cleaned out. A man crawled all around there and cleaned out the furnaces and cemented them all around the side so as to prevent air from getting in the furnace so as to make a genuine test. I thought he was sincere and I thought he would make a genuine test. He got through sometime between 7 and 9 o'clock and said, 'Everything is ready for the test to-morrow morning except the scales. You haven't the scales in the pit.' I said, 'It is all right; I will have them by 7 o'clock, and that will be all right.' We both parted agreeably and he went off. Next morning I got at the plant about 4 o'clock, and before 7 I had the scales down in the pit, and the boxes in it to weigh the coal and Mr. Vick came. I usually came back about 8 o'clock— from 8 to 8:30, and he had an expert with him and he then raised the question about making this test ordinarily,—that is, in the ordinary way he prepared to make it the day before. He said that there might be some leak in the pipes that was not in the other pipe, that it was a little more fair to him the other way than it was this way. He wanted to make it that way, and

he wanted to make it with the cold-water test. And I objected to that. Now, I said, 'I am willing to meet you half way in this thing because I am as anxious for a good result as you are. I don't object to paying for this furnace if it is an economy, and if you are willing to run six hours with the hot-water test and six hours with the cold-water test, I am with you, and we will go ahead and make it.' It was positively understood that would be done. I then went off to breakfast and when I got back they were all sitting around in the engine room. I said, 'What is the matter?' and Mr. Vick said, 'I am going to make this test with cold water.' I said, 'Won't you make it half one way and half the other?' And he said, 'No, we are going to make it altogether with cold water,' And I said, 'I don't agree to that.' He had on his overalls and jumpers too,— I think he had on jumpers; and he pulled them off and said, 'I will wipe my hands of the whole business.' And he went off. My objection to his making the test the way he wanted to make it was that he was to save us from 12 to 15 per cent of coal. I wanted the actual saving in coal, and I wanted a test made under the conditions that we were then running the boilers, and expected to run them under in the future at all times. And he being more of an engineer than I was, when he put it into figures, say so many pounds of cold water evaporated by so many pounds of coal, say so many of this to one of the other, I could not refute it,—I could not deny it. But when he burned so many pounds of coal to evaporate so many pounds of water running under the conditions that we were then running under, I would know whether I was saving money or not saving money. It was a matter of calculation. It was a fact what was being done. We evaporated so many pounds of water with so many pounds of coal. If it had to be calculated, then he might confuse me in figures. The furnace consumed smoke in this regard, if you let the furnace or boilers do about two-thirds of their capacity or about two-thirds of what they really ought to do, you would see very little smoke, but if you forced those boilers to their capacity, not saying 25 per cent over their capacity, but even up to that capacity, there would be as much smoke as there would

be from the other furnace we have in there now that is not equipped with the Hawley down draft furnace. This is, running the boiler on two-thirds duty."

"Vick turned to the page of the circular where the guaranty was written, and pointing to one of the lines with his finger, he said, 'This is what we guarantee.' (And the witness indicated the following paragraph in the circular which was in words and figures as follows:

*"The Hawley down draft furnace* can be attached to any type of water tube, tubular or flue boilers, and is offered to steam users with the following guaranties:

"1. To consume 95 per cent of the smoke under all conditions, regardless of quality of soft coal burned.

"2. Will burn 30 to 40 lbs. of coal per hour per foot of grate surface, with good economy.

"3. Will evaporate 10 per cent more water per pound of coal than can be done by any other system.

"4. Will increase the capacity of the boilers 50 per cent with perfect safety and good economy of coal.

"5. Will furnish uniform temperature of more than 2,500 degrees Fahrenheit to every part of heating surface.

"6. Will cost less for repairs than any other furnace or stoker.")

Thereupon, the defendant, in order to show what the furnaces of the plaintiff were and the other guaranties made by the plaintiff in its said circular, and because of the testimony heretofore set forth, offered the entire circular in evidence, the whole of said circular having been previously submitted to the court, and which said circular besides other descriptions on other pages contained on page 11, the following guaranties:

*"We Guarantee*

"To prevent 95 per cent of the smoke, burning any grade bituminous coal.

"It will increase the capacity of the boilers from 25 to 50 per cent.

"It will save from 10 to 40 per cent in the cost of fuel.

"Should our furnaces fail to do as guaranteed, we agree to remove them and replace the former setting at our expense."

On the same page over the reproduction of a Hawley down draft grade, are the words:

"All our furnaces are sold upon positive stated guaranties of economy, increased capacity, and smokelessness, and attached to boilers at our expense."

To the admission of which circular the plaintiff objected and the court sustained the objection, to which the defendant by its counsel then and there excepted, and the court noted said exception upon its minutes.

Thereupon, in connection with the foregoing testimony and matters, the witness on cross-examination further testified that the Hawley down draft furnaces were still being used by the defendant.

Thereupon, in connection with the foregoing testimony and matters, the defendant to maintain the issues joined on its behalf produced George C. Thompson, who testified:

"I am and have been in the employ of the Purity Ice Company as engineer for the past eight years. I am familiar with the old plant which consumed 8 tons and 10 cwt. of coal in twenty-four hours. It takes less coal to run a 200-horse-power boiler than it does to run a 100-horse-power boiler, both having the same amount of work to do. It took nine tons of coal to run the machinery with the new boilers having the Hawley draft furnaces attached, although on the new boilers we had an automatic feed which is supposed to save 10 per cent of coal, and which device was not on the old boilers. The capacity of the plant beginning in August, 1901, was enlarged, but up to that time was the same as it had been for the seven years;" and thereupon the defendant rested. The foregoing is all the testimony offered in the case on trial.

Whereupon the plaintiff, by its counsel, moved the court to strike out all the testimony of all the witnesses in the case, whether on direct or cross-examination, touching conversations or negotiations between the plaintiff and defendant antecedent to the agreement of February 11, 1901, given in evidence in this case, also all testimony concerning representations as to capacity of furnaces, either as to saving of fuel, consumption of smoke,

or on any other subject connected with said furnaces; as to conversations, agreements, or arrangements as to tests between the plaintiff and defendant, also the catalogue offered in evidence by the defendant so far as it was admitted in evidence; and the court granted the motion; to which the defendant by its counsel then and there duly excepted, and the court noted said exception upon its minutes.

The court then instructed the jury that the evidence on behalf of defendant constituted no defense to the action. Verdict for plaintiff for $500 was followed by judgment, from which defendant has appealed.

*Mr. Myer Cohen* and *Mr. Adolph G. Wolf,* for the appellant:

1. The circular or catalogue of the Hawley Down Draft Furnace Company, appellee, should have been admitted in evidence to identify the subject-matter with reference to which the parties were treating. Parol testimony is always admissible in the construction of contracts, to define the nature and qualities of the subject-matter, the situation and the relations of the parties, and all the surrounding circumstances. Greenleaf, Evidence, §§ 288, 289; *Bradley* v. *Washington, etc., Steam Packet Co.* 13 Pet. 89; *U. S.* v. *Peck,* 102 U. S. 64; *Fire Ins. Asso.* v. *Wickham,* 141 U. S. 564; *Stoops* v. *Smith,* 100 Mass. 63; *Rice* v. *Forsyth,* 41 Md. 389; See also the note to *Donley* v. *Tindall* (32 Texas, 43) in 5 Am. Rep. 241; and for a more specific case particularly applicable to the case at bar, see *Phelps* v. *Whittaker,* 37 Mich. 72.

2. The excluded evidence was admissible to explain the ambiguities existing in the writing, and the explanation necessarily shows that the real contract between the parties was much wider than the writing. The authorities are legion that parol evidence is admissible to explain such an ambiguity. The law is most clearly set forth in *Rice* v. *Forsyth,* 41 Md. 389. See, especially, *Warfield* v. *Booth,* 33 Md. 63, which, while not a case of warranty of quality, bears on the case at bar, both as to facts and pleading. See also *McCann* v. *Preston,* 79 Md. 223.

3. The evidence stricken out was admissible because it tended to show the breach of an independent express collateral agreement about which the written instrument is silent. This court has adopted the principle that evidence is admissible to show any collateral parol agreement which does not interfere with the *"terms of the written contract,* though it may relate to the same subject-matter." *Main* v. *Aukam,* 12 App. D. C. 389. The English authorities are Stephen's Dig. of Evidence, art. 90; *Lindley* v. *Lacey,* 17 C. B. (N. S.) 578; *Jeffrey* v. *Walton,* 1 Starkie, 267 (2 E. C. L. 108) ; *Allen* v. *Pink,* 4 Mees. & W. 140, a case of written contract with express warranty resting in parol. The Maryland authorities are *McCreary* v. *McCreary,* 5 G. & J. 147, 157; *Basshor* v. *Forbes,* 36 Md. 154; *Fusting* v. *Sullivan,* 41 Md. 162, where the court discusses the principle and reviews the Maryland cases. In *Seitz* v. *Refrigerating Co.* 141 U. S. which we shall discuss hereafter, at page 517 the Supreme Court has adopted the same doctrine. In the case of *Phelps* v. *Whittaker,* 37 Mich. 72, the court admitted evidence of oral representations made by the agent of the manufacturer prior to the giving of a written order which contained no reference to the representations which had been relied upon; and especially to be noted is the admission of a printed circular containing "guaranties," shown to the defendant at the time of the sale and upon the strength of which he claimed to have given the order. *Chapin* v. *Dobson,* 78 N. Y. 74, is a much-cited case on the subject of parol warranties. Here the writing in evidence was similar to this, but the verbal warranty was much more indefinite. The seller merely agreed "that the machines should be so made that they would do the defendant's work satisfactorily," and the court sustained the admission of the evidence. The case of the *Red Wing Manufacturing Co.* v. *Moe,* 62 Wis. 240, is another in which the facts are similar. Representations were made that the machine was of 4 H. P. The writing was quite as broad as the writing here. The court excluded the parol evidence, but the case was reversed on appeal on this ground, the court saying that "the warranty and representations of capacity of the engine were cause and inducement of the

written contract, and that thereby the contract was procured."
See also *Neal* v. *Flint*, 88 Maine, 72; *Greenewalt* v. *Kohne*, 85
Pa. 369; *Ayer* v. *Bell Mfg. Co.* 147 Mass. 46. It may be contended in this court, as it was below, that the expressions of
Vick are mere expressions of opinion or puffing, and not warranties. He has thought by leaving express warranties out of
the written contract, to escape the effect of his representations;
but, whether he intended such representations as warranties or
not, the test is whether he was asserting facts, or merely an opinion or judgment upon matter about which he, as vendor, had no
special knowledge. In the former case there is a warranty; in
the latter, not. And this intention is a question of fact for the
jury. See Benjamin, Sales, ¶¶ 613, 614; *Shippen* v. *Bowen*,
122 U. S. 575; *Columbian Iron Works* v. *Douglas*, 84 Md. 44;
*Osgood* v. *Lewis*, 2 H. & G. 495; *Crenshaw* v. *Slye*, 52 Md. 140;
*Beals* v. *Olmstead*, 24 Vt. 114; *McClintock* v. *Emick*, 87 Ky.
167; *Ormsby* v. *Budd*, 72 Iowa, 80; *Drew* v. *Ellison*, 60 Vt.
401; *Powell* v. *Chiltick*, 89 Iowa, 513; *Enger* v. *Dawley*, 62 Vt.
165; Schouler, Personal Property, § 329.

4. Even if there was no express warranty, the evidence was
admissible to show the purpose for which the device was sold,
and as showing a breach of an implied warranty of its fitness
for that particular purpose. *Rice* v. *Forsyth*, 41 Md. 389;
*Brown* v. *Edginton*, 2 Mann. & G. (40 E. C. L. 601) 279.

5. The evidence was admissible to show the agreement on
the part of the appellee to perform a test without which the contract sued on was not to become operative. *Pym* v. *Campbell*, 6
El. & Bl. 370; *Wallis* v. *Littell*, 11 C. B. (N. S.) 369; *Burke* v.
*Dulaney*, 153 U. S. 228; *Juilliard* v. *Chaffee*, 92 N. Y. 529;
*Donaldson* v. *Uhlfelder*, 31 Wash. Law Rep. 428; *Reynolds* v.
*Robinson*, 110 N. Y. 654; *McCann* v. *Preston*, 79 Md. 223;
*Engel* v. *Scott & H. Lumber Co.* (Minn.) 61 N. W. 825; *Potter* v. *Phenix Ins. Co.* 63 Fed. Rep. 382.

6. The defenses were available under the pleadings. Stephen,
Pleading, pp. 175, 176; 1 Chitty, Pleading, pp. 414, 415;
Perry, Pleading, pp. 247, 248; Poe, Pleading, §§ 607, 609;
*Dushane* v. *Benedict*, 120 U. S. 630; *Groff* v. *Hansel*, 33 Md.

161; *Weaver* v. *Schriver,* 79 Md. 543; *Bell* v. *Sheridan,* 21 D. C. 370.

*Mr. Harrison J. Barrett* and *Mr. John Ridout,* for the appellee:

1. Parol evidence of a prior or collateral warranty is not admissible to vary the terms of a written contract where such contract expresses the full intent of the parties. Where a writing merely amounts to a memorandum of sales, or a receipt, then, this being merely a parol contract, parol evidence of a warranty would, of course, be admissible. *Seitz* v. *Brewers' Refrigerating Co.* 141 U. S. 510; *DeWitt* v. *Berry,* 134 U. S. 306; *Van Winkle* v. *Crowell,* 146 U. S. 42; *Rogers* v. *Garland,* 19 D. C. 24; *Cassard* v. *McGlannan,* 88 Md. 173; Tiedeman, Sales, § 196.

2. Nor is an agreement of warranty subsequent to the written contract binding except upon a new consideration. This, being a separate and independent agreement, sustained by a separate consideration, could, of course, be shown by parol evidence, even though the original contract is in writing. The test, which it is shown appellee agreed after the installation of the furnaces to make merely for the accommodation of appellant's manager, was, of course, not a warranty; and in any event it was subsequent to the contract, and no new consideration passed. Tiedeman, Sales, § 196.

3. There is nothing whatever in the evidence that discloses in the least any fraud on the part of the appellee; and appellant cannot bring in a warranty under the guise of fraud. *Seitz* v. *Brewers' Refrigerating Co.* 141 U. S. 510. A statement, in order to amount in law to a false representation, must be in regard to some existing fact, and not in regard to something that will or may happen in the future. This is mere matter of opinion. *Sawyer* v. *Prickett,* 86 U. S. 146; *Robertson* v. *Parks,* 76 Md. 118. But while a deliberate false statement as to the capacity of boilers, or of the saving qualities of a furnace, or such a statement as the party making the same could by reason

of his expert knowledge readily ascertain is false, might constitute fraud, yet no such false statements were made by the appellee, nor any statement made which Mr. Vick, by reason of his expert knowledge, could have ascertained was false. *Van Stone* v. *Stillwell & Pierce Mfg. Co.* 142 U. S. 128.

Mr. Justice SHEPARD delivered the opinion of the Court:

Upon a careful examination of the proceedings on the trial, which have been completely stated above, our conclusion is, that the court did not err in instructing the jury that the evidence failed to establish a legal defense. The written contract, in accordance with which the plaintiff delivered and installed the described furnace, and accessories, is plain and definite so far as it goes, and there is no claim that anything was inserted in, or omitted from, it through fraud, accident, or mistake.

The evidence does not tend to show that the acceptance of the written proposition, and the signature of the defendant thereto, which formed the contract, were obtained upon the condition that the contract should not take effect until the performance of a definite precedent condition. Hence the case was not brought within the scope of decisions establishing or recognizing the doctrine that extrinsic evidence may be given to show that the contract had never gone into effect at all. *Burke* v. *Dulaney,* 153 U. S. 228, 38 L. ed. 698, 14 Sup. Ct. Rep. 816; *Donaldson* v. *Uhlfelder,* 21 App. D. C. 489.

In a case relied on by both parties, where the agreement was unambiguous and definite, and there was no pretense of fraud, accident, or mistake, the Supreme Court of the United States has carefully considered the question of admissibility of parol evidence to establish a collateral agreement. *Seitz* v. *Brewers' Refrigerating Mach. Co.* 141 U. S. 510.

That was also an action upon a contract for the supply and erection of certain machinery, and the defense offered to prove that a certain capacity had been expressly represented and warranted before the execution of the contract by the defendant. This was held inadmissible. Chief Justice Fuller, who delivered

the opinion of the court, said: "Undoubtedly the existence of a separate oral agreement as to any matter on which a written contract is silent, and which is not inconsistent with its terms, may be proved by parol, if, under the circumstances of the particular case, it may properly be inferred that the parties did not intend the written paper to be a complete and final statement of the whole of the transaction between them. But such an agreement must not only be collateral, but must relate to a subject distinct from that to which the written contract applies; that is, it must not be so closely connected with the principal transaction as to form part and parcel of it. And when the writing itself upon its face is couched in such terms as to import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, were reduced to writing. * * * The machine which the company sold and which Seitz bought was a No. 2 size refrigerating machine as constructed by the company, and such was the machine which was delivered, put up, and operated in the brewery. A warranty or guaranty that that machine would reduce the temperature of the brewery to 40° Fahrenheit, while in itself collateral to the sale, which would be complete without it, would be part of the description and essential to the identity of the thing sold; and to admit proof of such an engagement by parol would be to add another term to the written contract, contrary to the settled and salutary rule upon that subject. Whether the written contract fully expressed the terms of the agreement was a question for the court, and since it was in this instance complete and perfect on its face, without ambiguity, and embracing the whole subject-matter, it obviously could not be determined to be less comprehensive than it was. And this conclusion is unaffected by the fact that it did not allude to the capacity of the particular machine. To hold that mere silence opened the door to parol evidence in that regard would be to beg the whole question."

We are inclined, however, to think that the reasons given for the exclusion of the evidence of the warranty in that case do

not apply in this, and that the evidence offered was properly admitted at the time. There seems to be a substantial difference between the conditions disclosed in the two cases. The contract in that case was a formal, mutual agreement, made upon the conclusion of the negotiations between the parties, into which the buyer afterwards sought to inject a special warranty. In the case at bar, one of the use plaintiffs, in person, solicited an order from the defendant, exhibiting to its representative a printed circular containing certain express warranties, and concluding thus: "Should our furnaces fail to do as guaranteed, we agree to remove them and replace the former setting at our expense." The printed representation of special, material advantages in the seller's furnace, coupled with the express warranty of performance in each particular, was reasonably calculated to influence the buyer, and cause him to accept the proposition to deliver and install the furnace for the consideration stipulated. Nor was it unreasonable for the buyer to assume that the printed guaranty formed an essential feature of the transaction without its express incorporation in the proposition and acceptance founded thereon.

In accordance with the principle declared in some well-considered decisions, the final proposition relating to the delivery to be made and the consideration to be paid would seem to constitute an independent part of the contract only, the remainder of which is found in the printed guaranty. *Phelps* v. *Whitaker*, 37 Mich. 72, 76; *Ayer* v. *Bell Mfg. Co.* 147 Mass. 46, 52, 16 N. E. 754; *Red Wing Mfg. Co.* v. *Moe*, 62 Wis. 240, 22 N. W. 414.

But the question of the admission of this evidence is not necessarily involved, and need not, therefore, be expressly determined. Conceding the admissibility of the printed guaranty, the court did not err in finally excluding all the testimony relating thereto from the consideration of the jury, because it fell short of establishing any defense to the action. The furnace was promptly delivered and attached to the defendant's boilers, and was in operation at the time when the evidence was given. Considering the warranty as an express part of the contract, it

was not incumbent upon the plaintiff, as a precedent condition, of recovery thereon, to show that the furnace would answer all the requirements of the warranty. The burden, on the contrary,. was upon the defendant to show that it was incapable, under proper management, of producing the substantial results that. had been warranted. This it failed to do, and appeared, there-fore, in the attitude of purchasing, receiving, and constantly using the furnace, and then resisting payment, without substan-tial evidence that it had failed to conform to the warranted standard. Its legal duty was to test the capacity of the furnace,. in the matter of guaranteed performance, in a fair and reason-able manner, and within a reasonable time under all the cir-cumstances; and, having thus demonstrated its failure, to notify the plaintiff, which, in the event of failure, had promised to re-move it and replace the former setting.

It appears from the testimony that the plaintiff, itself, offered' and prepared to make a test of the capacity of the furnace in a particular manner. Without showing wherein the method of the-proposed test was an insufficient or unreasonable one, the de-fendant insisted upon another which it also failed to show would answer these requirements. Each party declining to adopt the-method of test suggested by the other, nothing more was done-in the matter.

The plaintiff was under no obligation to make the test in order to demand payment. Its offer was voluntary. Having declined that offer, the duty of the defendant remained as above stated. The testimony given by the defendant's employee in charge of the furnace and boilers, respecting the general operation of the old plant and the new, was clearly insufficient, of itself, to show a breach of any warranty; and we do not understand that its sufficiency for that particular purpose has been claimed.

It follows that the judgment must be affirmed with costs. It it so ordered.                                   *Affirmed.*

A motion for a rehearing was overruled February 9, 1904..